J-S05031-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: C.R.D., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: N.D., FATHER | |
| | No. 1526 MDA 2015 |

Appeal from the Order Entered August 20, 2015
In the Court of Common Pleas of Lebanon County
Orphans' Court at No: 2015-187.

BEFORE:  BENDER, P.J.E., SHOGAN, J., AND PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                     **FILED MARCH 14, 2016**

N.D. (Father) appeals from the order of the Court of Common Pleas of Lebanon County (trial court), entered August 20, 2015, that granted the petition to terminate his parental rights to his son, C.R.D. (Child), born in June of 2011, that was filed by K.D. (Mother) on March 19, 2015.  We affirm on the basis of the trial court's opinion.

The record supports the following recitation of the facts of this case. Mother currently lives with Child and her fiancé, J.R.[1]  Father lived with Mother and Child for approximately one month after Child's birth before he

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1]  At the time of the hearing, Mother and J.R. planned to marry in September of 2015.

left for Teen Challenge in August of 2011. Father attended Teen Challenge as part of a plea agreement that permitted him to avoid jail time.[2]

Father has an extensive criminal history. He testified that he committed a series of burglaries when he was eighteen years old. (*See* N.T. Involuntary Termination Hearing, 8/20/15, at 115). After that, he "had a couple [m]isdemeanors where [he] went to the County [jail] for a couple months at a time." (*Id.* at 114). Father has had charges filed against him in Lebanon, Berks, and Schuylkill Counties. In 2010, he pleaded guilty to perjury for lying to a grand jury. Father believes that his expected parole date is June 17, 2016; however, Father currently faces charges for a number of burglaries and related offenses.

Mother testified that Father disappeared a lot and relapsed before he went to Teen Challenge. (*See id.* at 8). While at Teen Challenge, Mother and Father made contact by mail and telephone. Mother and Child visited Father at Teen Challenge about once a month. Father did not contribute towards Child's support while he was at Teen Challenge. During visits, Father would hold Child, while Mother fed him and changed him. Mother and Child visited four times for visits that lasted for a couple of hours. Father visited Mother and Child on a four-day pass and several eight-hour passes. Father remained at Teen Challenge until October of 2012.

---

[2] Father was incarcerated at the time of the hearing on this matter. He testified via video.

When Father completed Teen Challenge, he moved back in with Mother and Child and lived with them off and on until July of 2013. During this time, Mother asked Father to leave several times because he relapsed into drug use by using bath salts and abusing alcohol. Lebanon County Children and Youth Services became involved in January of 2013, when Father got high on bath salts while he was watching Child by himself. After this incident, Mother refused to leave Father alone with Child. Father had a landscaping job for two to three months during this time. He used the proceeds to pay fines he had incurred and he sometimes contributed toward Mother's rent.

When Father continued to disappear for a couple days at a time Mother asked him to leave. They ended their relationship in July of 2013 when Father relapsed into alcohol abuse. They have not resided together since.

Mother testified that when Father resided with Child he interacted with Child, but he performed, "little to no[]" parental duties. (*Id.* at 13). Father did not involve himself in Child's life and his financial support for Child ranged from, "little to none." (*Id.* at 26). Mother fed and bathed Child; Mother got up in the middle of the night with Child; and Mother put Child to bed. (*See id.* at 13-14).

Father had anger issues and broke things in the house. Mother testified that Father went "on-the-run" after they ended their relationship when a warrant was issued for his arrest. (*Id.* at 15). After that, Father

only saw Child one other time, and that was in September of 2013. At that meeting, Child did not want to go to Father. He remained "on-the-run" until he turned himself in sometime in May of 2014. (*Id.*; *see id.* at 16).

Mother petitioned for custody of Child on October 1, 2013. Father did not participate in those proceedings. Mother testified that she told Father about the custody proceeding but he did not want to acknowledge receipt of the paperwork; Mother had to publish notice in the newspaper and the legal journal. Mother testified that Father did not want to sign paperwork "because he assumed that he had a [b]ench [w]arrant and he didn't want to get set up and arrested." (*Id.* at 36). Mother testified that Father told her he would sign the paperwork for the notification about the custody hearing if she would give him his belongings. (*See id.* at 36-37). During this time, Mother did not know where Father was living, but she could contact him by telephone. Father did not tell Mother where he was living in September and October of 2013 because he was afraid she would turn him into the police. (*See id.* at 42). The trial court granted Mother primary physical custody and granted Father partial physical custody as he and Mother might agree.

Father gave a Christmas present to Child in Christmas of 2013 by dropping it off in the middle of the night and sending Mother a text message that it was there. He did not ask to see Child. When Father was on leave from Teen Challenge, he gave Child a birthday present, but he did not send a Christmas present in 2014, or a birthday present or card for Child's

birthday in 2015. Father drafted a letter to Child, but Mother did not give it to him.[3]

Mother did not receive any calls from April of 2014 until March of 2015. After Mother filed the involuntary termination petition, Father called Mother from the prison one day "over and over and over and over again" in response to express his anger about the proceedings. (*Id.* at 30). Mother ultimately refused to accept calls from the prison. On March 25, 2015, the state correctional institution issued a cease communication order on Father.

Mother testified that J.R. and Child have a father/son relationship. (*See id.* at 20). J.R. assists in feeding, bathing, and putting Child to bed. They have "daddy nights" on Friday nights and they play with Ninja Turtles and fish together. (*Id.*). Child went to monster truck races with J.R. and his family. Child refers to J.R. as "daddy." (*Id.*). J.R. contributes to Mother's and Child's support. J.R. testified he has lived with Mother and

---

[3] Although the letter was dated "2-24-15", the trial court noted in its opinion that "this letter was apparently sent after the involuntary termination proceeding commenced, and we are to disregard this letter." (Trial Court Opinion, 9/25/15, at 14).

However, even if the letter were sent prior to the commencement of the involuntary termination proceedings, it would not have been sufficient, in the face of the array of evidence to the contrary, to cause us to question the trial court's conclusion that Father "failed to perform those duties that are necessary to be a parent of this child." (N.T. Hearing, at 147); *see* 23 Pa.C.S.A. § 2311(a)(1).

Child for approximately one year and eleven months and that he has been gainfully employed for all that time.

Mother's father (Maternal Grandfather) testified that Father worked at his business but that he fired him because he did not show up to work. (*See id.* at 64, 67-68, 72). Maternal Grandfather testified that he did not observe a lot of interaction between Father and Child when they lived together. (*See id.* at 65). Mother took on the responsibility of taking care of Child. According to Maternal Grandfather, Child looks to J.R. as a father figure.

A church friend of Mother testified that Child looks to J.R. as a father figure and described their relationship as "[a] very healthy father/son relationship." (*Id.* at 76).

J.R.'s stepsister, S.B., testified that Father would "play with [Child] here and there but he wasn't around that much." (*Id.* at 79). She observed that a few months after J.R. met Child, Child "was like attached to [J.R.'s] hip. Like anywhere [J.R.] would go [Child] would go." (*Id.*).

Father testified that when he went to Teen Challenge, Mother brought Child to visit and that he "was writing letters the whole time" and "made how[ever] many phones calls a week [that he] was allowed to have[.]" (*Id.* at 87). He said that he visited once each month on an eight-hour pass, and he visited Child on his birthday on a four-day pass. (*See id.* at 88). Father claimed that he would take Mother out to eat, and he would pay, and that he gave her almost all of a tax refund while he was in Teen Challenge. Father

claimed that Mother's assertion that he struggled with relapsing was not true. Father stated that he contributed money toward a bill or whatever they needed.

Father admitted he was on the run because of an alleged hot urine test, and he was afraid he was going to be incarcerated. Father said he turned himself in, in April of 2014 and was in custody from April of 2014 until June 2, 2015.

Father testified that while in custody he would write Mother letters and would ask to be part of Child's life but he never received a response. Because she would not respond to the letters, he put her on his phone list at the prison, and he would try to call her. He eventually learned that the prison issued a notice to cease communications order with regard to Mother. Father claimed that he was sending letters to Mother instead of Child because Child could not read. Father would send his mother letters to give to Mother, but the prison said he could not do that either. Father said the reason he did not send a birthday gift or card was the notice to cease communications; he could have received new charges if he violated the notice. Father denied that Maternal Grandfather fired him for not showing up to work.

Father admitted that for most of Child's life he was incarcerated either in jail or at Teen Challenge and that that is why he has not been part of Child's life.

Paternal Grandmother testified that Father would write letters and make phone calls to Mother. (*See id.* at 124). She forwarded to Mother probably about five letters on behalf of Father. She testified that when Father was not incarcerated, Child "pretty much worshipped [Father]," and Child always wanted to be with him. (*Id.* at 123).

The trial court entered its order terminating Father's parental rights on August 20, 2015. Father filed his notice of appeal on August 31, 2015, and in response to the trial court's order of September 2, 2015, his concise statement of errors complained of on appeal on September 4, 2015.[4] *See* Pa.R.A.P. 1925.

Father raises the following questions on appeal:

1. Did the [trial] court err in ordering termination of parental rights without clear and convincing evidence in support of its determination?

[2.] Did the [trial] court err by terminating Father's parental rights when it failed to consider Mother's role in prohibiting a relationship between Father and [Child]?

[3.] Did the [trial] court err when it failed to consider the age and ability of [Child] as it relates to Father's attempts to contact and maintain a relationship with [Child]?

_____

[4] As there was no objection or claim of prejudice from Appellee to this untimely filing, we have accepted it in reliance on our decision in *In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009). *See In re K.T.E.L.*, *supra* at 748 (declining to quash appeal as untimely where concise statement was filed three days after notice of appeal, but no party raised objection); *see also* Pa.R.A.P. 905(a)(2) (requiring that concise statement of errors be filed with notice of appeal).

[4.] Did the [trial] court err when it terminated Father's parental rights by failing to consider Father's genuine interest and sincere, persistent, and unrelenting effort to maintain a close relationship with [Child]?

(Father's Brief, at 4) (most capitalization omitted).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1). Requests to have a natural parent's parental rights

terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(1), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). Further,

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

To terminate parental rights pursuant to section 2511(a)(1), the person or agency seeking termination must demonstrate through clear and convincing evidence that, for a period of at least six months prior to the filing of the petition, the parent's conduct demonstrates a settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Our Supreme Court has held:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988) (citation omitted). Further,

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the

evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

***In re N.M.B.***, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005) (citations omitted).

With regard to incarcerated persons, our Supreme Court has stated:

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

***In re Adoption of S.P.***, 47 A.3d 817, 828 (Pa. 2012) (citation omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child, but our case law requires the evaluation of any such bond. ***See In re E.M.***, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. ***See In re K.K.R.-S***., 958 A.2d 529, 533 (Pa. Super. 2008).

With the above standard of review in mind, we have thoroughly reviewed the record, briefs, and the applicable law, and determined that the

evidence presented is sufficient to support the trial court's order terminating Father's parental rights to Child.

In addition, our close reading of the trial court's opinion reveals that the trial court carefully and methodically reviewed the evidence and ably addressed Father's issues presented on appeal. Accordingly, we affirm on the basis of the concise, thoughtful, and well-written opinion of the Honorable Samuel A. Kline.

Therefore, for the reasons stated, we affirm the order of the Court of Common Pleas of Lebanon County that terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1).

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2016

IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY,
PENNSYLVANIA

ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN RE: | : | |
| | : | |
| INVOLUNTARY | : | Case No: 2015-187 |
| TERMINATION OF C.R.D. | : | |

APPEARANCES:
Frederick Wolf, Esq. for the biological mother
Frederick Long, Esq. for the biological father[1]
Jon Arnold, Esq. for the child

**OPINION, KLINE, J., SEPTEMBER 25, 2015**

On August 20, 2015, this Court terminated the paternal rights of N.D. (hereinafter "Father") to minor child, C.D. Before us is Father's Concise Statement of Errors Complained of on Appeal. For the reasons set forth herein, we find all alleged errors lack merit, as specified below.

FACTS AND PROCEDURAL HISTORY

On March 19, 2015, K.D. (hereinafter "Mother") filed a petition for involuntary termination of Father's parental rights of C.D. Mother claimed that Father failed to perform his parental duties for over 1 year. A hearing was held on August 20, 2015. The record reflects the following relevant facts.

K.D. is the biological mother of C.D. (N.T. 6). C.D. was born on June 4, 2011. (N.T. 7). Mother lives with C.D. and her fiancée (hereinafter "J.R.") (N.T. 7). C.D. has resided with Mother since his birth. (N.T. 15). Mother is a stay at home mom. (N.T. 21). She is a disabled veteran and receives a

---

[1] During the involuntary termination hearing and commencement of the appeal process, Jessica Weaver, Esq. represented Father. Attorney Weaver filed the notice of appeal and sought withdrawal asserting that she would no longer be a practicing attorney in Lebanon County effective September 4, 2015. Therefore, she requested substitute counsel to be appointed for the remainder of the appeal. Accordingly, Frederick Long, Esq. was appointed to represent Father.

1

SCANNED IMAGE

veteran's income on a monthly basis. (N.T. 48). Mother and J.R. plan to marry on September 26, 2015. (N.T. 7, 19). N.D. is the biological father of C.D. (N.T. 7). Father was present at the birth. (N.T. 37). After C.D. was born, Father lived with Mother and C.D. for approximately one month, then Father was absent for a month, then he left for Teen Challenge. (N.T. 7-8). Beginning in August of 2011, Father attended Teen Challenge as part of a criminal sentence. (N.T. 37). Father entered into a plea agreement which allowed him to go to Teen Challenge for 14 months instead of going to jail. (N.T. 8). Mother testified that Father disappeared a lot and relapsed before he went to Teen Challenge. (N.T. 8). While at Teen Challenge, Mother and Father made contact by letters and the telephone. (N.T. 8). Toward the second half of the sentence, Mother visited Father about once a month, and she took C.D. with her. (N.T. 9). Father did not work nor contribute towards C.D.'s support while at Teen Challenge. (N.T. 9). During the visits, Father would hold the child, and Mother fed the child and changed diapers. (N.T. 9). There were 4 total visits, and the visits lasted for a couple hours. (N.T. 9, 10). Father received a 4 day pass and some 8 hour passes from Teen Challenge, and he would visit Mother. (N.T. 27). Father visited in June of 2012 over C.D.'s birthday. (N.T. 38). Father remained at Teen Challenge until October of 2012. (N.T. 37).

After Father completed Teen Challenge, he moved back in with Mother and C.D. (N.T. 10, 38). He lived with them off and on until July of 2013. (N.T. 10). Mother asked Father to leave several times because he relapsed by using bath salts. (N.T. 10-11). In January of 2013, there was an incident when Children and Youth Services became involved by telephone because Father was high on bath salts while he was watching C.D. by himself. (N.T. 39-40). After this incident, Mother refused to leave Father alone with the

2

child because she was afraid that would happen again. (N.T. 13, 40). Also during this period of time, Father had a landscaping job for 2 to 3 months. (N.T. 11). Father had to pay fines and sometimes he contributed towards the rent. (N.T. 26).

Father would continue to disappear for a couple days at a time which resulted in Mother asking him to leave. (N.T. 11). They ended their relationship in July of 2013 when Father had a relapse with alcohol. (N.T. 13, 40). They did not reside together again after their relationship ended. (N.T. 15). There was a time when Father asked to see C.D., but Mother said no. (N.T. 43).

Mother testified that when Father resided with C.D., he interacted with him, but he performed "little to none" parental duties. (N.T. 13). There was not a lot of involvement by Father in C.D.'s life. (N.T. 8). Father also contributed "little to none" with regard to support of C.D. (N.T. 8). Mother fed and bathed C.D. (N.T. 13). Mother got up in the middle of the night with C.D. (N.T. 29). Mother put C.D. to bed. (N.T. 14). Father would play with C.D. (N.T. 14). Father also had anger issues and broke things in the house. (N.T. 14). After they ended their relationship, Mother testified that a warrant was issued for Father. (N.T. 16). He went "on the run" until he turned himself in sometime in May of 2014. (N.T. 16). After they ended their relationship, Father only saw C.D. one time in September of 2013. (N.T. 16, 41). When Mother's and Father's relationship ended and Father was not around, C.D. initially asked where Father was. (N.T. 19). When Father showed up in September of 2013, C.D. did not want to go to Father. (N.T. 19).

Father has been incarcerated, and he has sent letters to Mother. (N.T. 16). Mother acknowledged that she received love letters to her, and that Father might have inquired how C.D. was doing. (N.T. 17). After the

3

involuntary termination proceeding commenced, Father drafted a letter to C.D., but Mother did not give it to him. (N.T. 17). Father gave a Christmas present to C.D. in Christmas of 2013. (N.T. 22). Father dropped it off in the middle of the night with a text message saying it was there. (N.T. 22). There was no request to see C.D. when she received the text message. (N.T. 46). When Father was on leave from Teen Challenge, he provided a birthday present. (N.T. 22). The presents consisted of monster trucks, Mickey Mouse, and some remote control race cars. (N.T. 22). Father did not send a Christmas present in 2014 or a birthday present or card in June of 2015. (N.T. 46).

Mother petitioned for custody on October 1, 2013, and Father did not participate in the proceedings. (N.T. 18, 25). A Court Order was entered which gave Mother primary physical custody with Father having periods of partial custody as the two could agree. (N.T. 18, 42). Mother testified that Father knew about the custody proceeding verbally, but he did not want to sign the papers. (N.T. 18). Mother had to publish the notice in the newspaper and the legal journal. (N.T. 18). Mother testified that she reached out to Father to sign paperwork, but he did not want to sign it "because he assumed that he had a bench warrant and he didn't want to get set up and arrested." (N.T. 36). Mother testified that Father told her he would sign the paperwork for the notification about the custody hearing if she would give him his belongings. (N.T. 37). During this time, Mother did not know where Father was living, but she could communicate with him by telephone. (N.T. 42). Father did not tell Mother where he was living in September and October of 2013 because he was afraid she would turn him into the police. (N.T. 42).

While incarcerated and after the involuntary petition was filed, Father called Mother one day "over and over and over and over again" in response to

4

these proceedings because he was angry. (N.T. 18, 30-31). Mother ultimately refused calls from the prison. (N.T. 30). Mother received no phone calls from April of 2014 until March of 2015. (N.T. 32). On March 25, 2015, the state correctional institution issued upon Father a notice to cease communication order, but Mother did not know about it. (N.T. 34-35, Exhibit 1).

Mother testified that C.D. and J.R. have a father/son relationship. (N.T. 20). J.R. assists in feeding, bathing, and putting C.D. to bed. (N.T. 20). They have "daddy nights" on Friday nights. (N.T. 20). They play with Ninja Turtles and fish together. (N.T. 20). C.D. went to monster truck races with J.R. and his family. (N.T. 20). The child has stated "I wanted my daddy" or "I want to give my dad a kiss" with regard to J.R. (N.T. 20). J.R. contributes to Mother's and C.D.'s support. (N.T. 20).

J.R. testified at the hearing. J.R. has lived with Mother and C.D. for approximately one year and 11 months. (N.T. 49). Since J.R. and Mother have resided together, J.R. has been gainfully employed. (N.T. 47, 50). J.R. is currently employed at Smucker Company in Lancaster where his responsibilities include doing drywall and insulation, framing, and hanging acoustic ceilings. (N.T. 50). J.R. works 40 hours a week. (N.T. 50). J.R. testified that he has a father/son relationship with C.D. (N.T. 51). He rides bikes, plays basketball and Ninja Turtles with C.D. (N.T. 51). C.D. helps him do yard work and side projects. (N.T. 51). J.R., Mother, and C.D. do activities together which include riding bikes, going to the beach, going camping, going on walks, and having family birthdays and picnics. (N.T. 51). J.R. has conversations with C.D., and they are generally about "whatever he wants to talk about." (N.T. 51). J.R. disciplines C.D., which includes making him sit and stand in corners. (N.T. 52). J.R. and C.D. hug and kiss each other. (N.T. 52). J.R. assists C.D. with going to bed and with dinner. (N.T. 52). J.R.

5

previously had two DUIs, but alcohol is no longer an issue. (N.T. 52-53). J.R. contributes to the support of the family, and he and Mother have a joint bank account. (N.T. 53). J.R. has bought C.D. Christmas toys, Ninja Turtle action figures, movies, toys for outside, and pools. (N.T. 53). J.R. does activities with other families with young children, and C.D. enjoys interacting with them. (N.T. 54). C.D. is a happy, healthy young child. (N.T. 54). When J.R. first became involved with C.D., J.R. sensed that he was lacking a father in his life. (N.T. 54). C.D. initially asked about Father, but C.D. eventually outgrew this inquiry and J.R.'s relationship with C.D. started to grow. (N.T. 60). J.R. intends to adopt C.D. (N.T. 56-57). J.R. testified that C.D. calls him "Dad." (N.T. 57). J.R. has a father, mother, three brothers, and four sisters, and all live in the area and have formed a relationship with C.D. (N.T. 60-61).

The maternal grandfather testified at the hearing. (N.T. 62). For a couple months, Father worked at his business, but was later fired because he did not show up to work. (N.T. 64, 68, 72). The maternal grandfather testified that he was able to observe Father and C.D. when they resided together, and there was not a lot of interaction. (N.T. 65). Even outside the house, Mother took on more of the responsibility with taking care of C.D. (N.T. 65). The maternal grandfather has observed J.R. and C.D. together, and he testified that C.D. looks up to J.R. (N.T. 66). He described J.R. as a father figure and a leader type figure. (N.T. 66). C.D. initially called J.R. by his name but started to refer to him as "dad' as their relationship grew. (N.T. 66-67).

A church friend testified on behalf of Mother. Mother became acquainted with many individuals through church, and she held a Bible study at her house. (N.T. 74, 77). Father initially went to the Bible study but ultimately stopped. (N.T. 74). She had conversations with Father about

6

straightening out his life. (N.T. 74). She also has observed J.R. with C.D., and said that C.D. looks to him as a father and described their relationship as "a very healthy father/son relationship." (N.T. 76).

J.R.'s stepsister, (hereinafter "S.B.") testified. There were times when she observed C.D. with Father and with J.R. (N.T. 79). She testified that Father would "play with him here and there but he wasn't around that much." (N.T. 79). She observed Mother, Father, and C.D. together approximately six times. (N.T. 83). When J.R. met C.D, she testified that after a few months or so, C.D. "was like attached to [J.R.'s] hip. Like anywhere [J.R.] would go [C.D.] would go." (N.T. 79). She observed them hug and kiss each other. (N.T. 81).

Father also testified at the hearing. Initially when he went to Teen Challenge, Mother brought C.D. to visit. (N.T. 87). Father testified that he "was writing letters the whole time" and "made how many phones calls a week." (N.T. 87). He would visit once a month on an 8 hour pass, and he visited C.D. on his birthday on a 4 day pass. (N.T. 88). Father asserted that he would take Mother out to eat, and he would pay, and he gave her almost all of a tax return while he was in Teen Challenge. (N.T. 89-90). Father claimed that Mother's assertion that he struggled with relapsing was not true. (N.T. 91). Father stated that he contributed money toward a bill or whatever they needed. (N.T. 93). Father claimed that once he stopped working, he continued to contact Mother to inquire about C.D. (N.T. 93).

Father provided the following testimony with regard to the custody proceeding.

Question: Okay. Did you know that she filed for custody?

Answer: No, I didn't know that until she called my phone and tried to offer me all the stuff that was in the house as a

7

way for me to go and sign my rights over. But I didn't know at the time. Like she's saying it was for sole custody or whatever. I didn't know any of that. All I knew was she said oh, I'm going to have to take this bill I'll give you everything that's in your house if you come and sign these papers. I thought she was trying to trick me to sign my rights over completely to my son. I said listen, material objects don't mean anything to me, I'm not going to sign my son over for material things.

Question: But did you ever know anything about the custody process that was proceeding? Did you ever receive a copy of the Custody Order?

Answer: No:

Question: Okay. If you had known that there was a Custody Order or custody process going on would you have participated?

Answer: Honestly I was on the run so probably not. I'm not going to lie. You know I was on the run. I didn't know—I didn't know what kind of custody proceedings were happening at the time. And I'm not going to lie and say oh, yeah, I would have showed up knowing that I probably would have got arrested.

(N.T. 94-95). Father indicated he was "on the run" because of an alleged hot urine test, and he was afraid he was going to be incarcerated. (N.T. 112). Father acknowledged he was in Pittsburgh when he had a bench warrant out on him. (N.T. 96). Father said he turned himself in April of 2014, and he was in custody basically from April of 2014 until June 2nd. (N.T. 97).

At some point when Father was "on the run," he learned from his mother that C.D. was in the hospital. (N.T. 113). He claimed, "I wanted to go there but everybody told me not to show up and they wouldn't tell me what contacted an attorney to try to see his son. (N.T. 114).

8

While in custody, Father testified that he would write Mother letters and would ask to be part of C.D.'s life, but he never received a response. (N.T. 98). Since she would not respond to the letters, he put her on his phone list at the prison, and he would try to call her. (N.T. 98). He eventually learned that the prison issued a notice to cease communications order with regard to Mother. (N.T. 99). Father claimed that he was sending letters to Mother instead of C.D. because C.D. could not read. (N.T. 100). Father would send his mother letters to give to Mother, but the prison said he could not do that either. (N.T. 101). The reason he did not send a birthday gift or card was because of the notice to cease communications. (N.T. 101). Father said he could have received new charges if he violated the notice. (N.T. 99). Father claimed that the assertion he was fired from the maternal grandfather's business for not showing up to work was not true. (N.T. 102). Father testified that he thinks about C.D. every day, and he asserted that his primary concern is what's in the best interest of C.D. (N.T. 103). Father testified that he wants to be in C.D.'s life, and he wanted to help raise him to not make mistakes that he made. (N.T. 104).

Father agreed that for most of C.D.'s life, he was incarcerated either in jail or at Teen Challenge. (N.T. 110). Father asserted he really has not been able to be involved in C.D.'s life because he's been incarcerated. (N.T. 112). Of the 4 years that C.D. has been alive, Father has spent one year of that time legally on the street. (N.T. 121).

Father has an extensive criminal history. (N.T. 118-121). Father was incarcerated in 2003. (N.T. 114). Father testified that he committed a bunch of burglaries when he was 18 years old. (N.T. 115). After that, he "had a couple misdemeanors where [he] went to the County for a couple months at a time." (N.T. 114). Father has had charges filed against him in Lebanon,

9

Berks, and Schuylkill County. (N.T. 114-115). In 2010, he pled guilty to perjury for lying in a Grand Jury investigation. (N.T. 115). Father received a 6 month concurrent sentence for a theft charge in Lancaster County, but he asserted that "It's already done." (N.T. 118). Father believes that his expected parole date is June 17, 2016. (N.T. 97). Father is currently charged with numerous burglaries and related offenses. (N.T. 115).

The paternal grandmother testified that Father would write letters and make phone calls to Mother. (N.T. 124). She forwarded to Mother probably about 5 letters on behalf of Father. (N.T. 127, 131). She testified that when Father was not incarcerated, C.D. "pretty much worshipped [Father]," and C.D. always wanted to be with Father. (N.T. 123).

At the conclusion of the hearing, this Court granted the Petition for Involuntary Termination. On August 31, 2015, Father filed a notice of appeal. On September 4, 2015, Father filed a Concise Statement of Errors Complained of on Appeal. Father raises four alleged errors which are as follows:

> 1. The Court erred in ordering termination of parental rights of Father given the lack of clear and convincing evidence to support the Court's conclusion thereof.
>
> 2. The Court erred when it involuntarily terminated Father's parental rights by failing to consider the age and ability of the minor child in relationship to Father's attempt to contact and maintain a relationship with the minor child.
>
> 3. The Court erred when it involuntarily terminated Father's parental rights by failing to consider Mother's role in prohibiting contact between Father and the minor child.
>
> 4. The Court erred because the evidence demonstrated that Father had a genuine interest and sincere, persistent, and

unrelenting effort to maintain a parent-child relationship with the minor child.

(See Concise Statement). The case is thus before us and ripe for disposition.

## DISCUSSION

The grounds for involuntary termination of parental rights are governed by Section 2511 of the Adoption Act. The statue provides the following, in relevant part:

§ 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. §2511(a)(1). In addition:

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). Our Superior Court has recently stated:

The test for terminating parental rights consists of two

11

parts...Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re P.Z.,* 113 A.3d 840, 850 (Pa. Super. 2015) (citations omitted).

### *Parental Duties*

To satisfy Section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination.

Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or

12

fails to perform parental duties.

*In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (citations omitted). "Although the six month period immediately preceding the filing of the petition is most critical to the analysis, the court must consider the whole history of the case and not mechanically apply the six-month statutory provision." *In re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009).

"Parental duties" has been defined as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life'.
>
> A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. This court has repeatedly recognized that parental rights are not preserved ... by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs.

*In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003) (citations omitted).

13

The involuntary termination petition was filed on March 19, 2015. Therefore, approximately September 19, 2014 was 6 months before the petition was filed. The record indicates that Father basically did nothing for the child from September 19, 2014 through March 19, 2015.

Even looking past the 6 month time period, the record sadly indicates that Father has not done a lot for the child over his entire life. C.D. is approximately 4 years old, and Father has only legally been a part of society for 1 year of C.D.'s life. Father has spent a majority of C.D.'s life either in Teen Challenge, in jail, or hiding and evading his arrest. After C.D. was born, Mother testified that Father would disappear at times and he relapsed with bath salts and/or alcohol. Mother testified that there was not a lot of involvement from Father when he lived with C.D. Father contributed "little to none" with regard to C.D.'s support. We find Mother's testimony to be credible.

There was testimony that Father gave a Christmas present to C.D. in Christmas of 2013, and he provided a birthday present. There was also testimony that Father visited the child when he got a 4 day pass and 8 hour pass from Teen Challenge. However, these facts by themselves do not mean that Father has performed his parental duties as they are overshadowed by everything Father has not done for C.D.

There was testimony that Father would call Mother and write letters to Mother throughout his incarceration and/or while at Teen Challenge. Mother indicated that the letters were basically love letters to her, and he generally asked about C.D. Although, one of the letters was directed to C.D., this letter was apparently sent after the involuntary termination proceeding commenced, and we are to disregard this letter. Nonetheless, these communications do not mean that Father has performed his parental duties.

14

Father specifically claims that the Court failed to consider Mother's role in prohibiting contact between Father and C.D.

> Before a trial court may terminate the parental rights of a non-custodial parent, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child.

*In re C.M.S.*, 832 A.2d at 463.

After Father completed Teen Challenge, he moved back in with Mother and C.D. He lived with them off and on until July of 2013. Mother testified that she asked Father to leave "a bunch of times because he was relapsing." Mother testified to an incident in January of 2013 when CYS was contacted because Father relapsed with bath salts while he was watching C.D. by himself. After this incident, Mother refused to leave Father alone with the child as she was afraid it would happen again. We do not fault Mother as she was clearly putting C.D.'s well-being first.

There was testimony that Father repeatedly called Mother one day while incarcerated in response to these proceedings because he was angry. Mother ultimately refused calls from the prison, and the prison sent out a notice to cease communication order. This call was made after the petition was filed in this matter, so even assuming that this is considered an effort to communicate with C.D., as opposed to an angry phone call to Mother, we cannot consider it. Mother testified that she was not even aware that the prison sent out the notice to cease communications, so we cannot conclude that she deliberately erected any barriers to impede Father's effort to maintain a relationship with the child.

15

Father also claims that the Court failed to consider the age and ability of the minor child in relationship to Father's attempt to contact and maintain a relationship with the child. Father and his counsel at the hearing appeared to emphasize that C.D. cannot read so he would be unable to read letters. However, this argument completely fails to acknowledge that Mother could have read letters to C.D.

Finally, Father contends that he had "a genuine interest and sincere, persistent, and unrelenting effort to maintain a parent-child relationship." This conclusion is an extreme distortion of the truth. Mother testified that she filed a petition for custody, and she reached out to Father to sign paperwork for notice of the custody hearing. Mother asserts that Father did not want to sign the paperwork because he had a bench warrant out, and he did not want to be arrested. We find Mother's testimony to be credible on this matter. Father even admitted that had he known about the custody proceeding, he would not have shown up for it because a warrant was out for his arrest, and he would have been taken into custody. The Court is convinced that Father certainly knew that Mother was attempting to initiate custody proceedings, Mother spoke about it with Father on the telephone, and Father deliberately avoided being served or informing Mother where he was due to the fact he had a bench warrant. Father asserts that he has exhibited a "sincere, persistent, and unrelenting effort to maintain a parent/child relationship." However, when it was time to resolve the issue of custody, Father chose to ignore the proceeding because he was afraid he would be taken into custody.

What the Court finds to be even more disturbing is that, by his own testimony, he acknowledged that he learned this his own child was in the hospital and he still chose not to visit C.D. He testified, "I wanted to go there

16

but everybody told me not to show up and they wouldn't tell me what hospital he was in..." Father appears to cast blame on others claiming that nobody would tell him where C.D. was located.

The Court simply does not believe Father. The Court is of the belief that Father clearly did not want to go to the hospital because a warrant was out for his arrest, and he did not want to be taken into custody. Even assuming what Father says is true that "nobody told him what hospital he was in," Father could have taken the initiative to contact hospitals or even Mother to learn what hospital C.D. was in. Father may claim that he has demonstrated a "sincere, persistent, and unrelenting effort to maintain a parent/child relationship," but these are mere words. Father's actions speak volumes, and it appears that Father cares about himself more than C.D.

Accordingly, we find all of Father's alleged errors lack merit. Mother has sustained her burden, and the record reveals by clear and convincing evidence that Father has failed to perform parental duties for at least six months prior to the petition for termination being filed. Therefore, termination of Father's parental rights is appropriate under Section 2511(a)(1).

### *Needs and Welfare*

A needs and welfare analysis is mandated by statute, and it is distinct from a determination of whether a parent's conduct justifies termination of parental rights under the statute. *In re C.LG.*, 956 A.2d 999, 1004 (Pa. Super. 2008).

> We recognize that the primary consideration in the termination of parental rights is the best interests of the child. Indeed, as this Court has stated,
>
> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the

17

intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*C.S.*, 761 A.2d at 1202 (citations omitted).

We will first address Father's incarceration.

Where a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with his or her child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children.

*In re B., N.M.,* 856 A.2d 847, 855 (Pa. Super. 2004).

Father certainly has not provided for C.D.'s needs and welfare in the past, and Father is currently incarcerated. Father believes he will be paroled in June of 2016. Father was 30 years old at the hearing. Father has an extensive adult criminal history dating back to 2003. It appears that he is a "career criminal." When Father is done serving his current sentence, his future is still in question because a criminal information was just lodged against Father in June of 2015 in the Lebanon County Court of Common

18

Pleas charging Father with burglaries and related offenses.[2] There is a distinct difference between Father not having any other criminal charges when he is done serving his current sentence and Father having pending charges for numerous burglaries.

What the Court gives significant weight and finds to be the most important part of this needs and welfare assessment is that there clearly is a father/child bond between J.R. and C.D that should not be disturbed. Mother testified that C.D. and J.R. have a father/son relationship, and J.R. has performed numerous parental duties. Mother testified C.D. has stated "I wanted my daddy" or "I want to give my dad a kiss" with regard to J.R.

J.R. has had consistent employment, and he is currently employed. J.R. has a steady income, which will assist in providing support for C.D. J.R. also testified that he has a father/son relationship with C.D., and he performs extensive parental duties. J.R. testified that C.D. calls him "Dad." In addition, the maternal grandfather, a church friend, and J.R.'s stepsister all testified that they have witnessed the bond between J.R. and C.D. We find that the testimony of all witnesses that there is a father/child bond between J.R. and C.D. to be credible.

To conclude, it is time for continuity in the child's life with regard to a father figure. For ¾ of C.D.'s life, Father has been in Teen Challenge, in jail, or "on the run." Even when Father was living with Mother, Father would disappear at times. Two witnesses testified that they had conversations with Father about getting his life in order after C.D. was born, and Father still has not listened. Father's parental responsibilities are not tolled in order for him to get his life together. At some point, we all must say "enough is enough."

---

[2] We note Father has been charged with a total of 21 counts including 8 counts of burglary for 8 separate victims, which include various convenience stores/gas stations. (Case No: CP-38-CR-1035-2015).

19

C.D. should not have to continually wonder as he grows if dad is going to be around or in prison. J.R. has taken on the responsibility of raising a child that is not even his, and he intends to adopt the child. Disturbing the bond between J.R. and C.D. would not be in the child's best interests but would only further instability in the child's life.

For all the aforementioned reasons, we find all alleged errors lack merit and affirm our Order dated August 20, 2015. We now turn this case over to the Superior Court for review. We will enter an Order consistent with the foregoing.